# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

     **v.**

**JAVIER ANGEL MARTINEZ,**

     **Defendant.**

**Case No. 5:19-cr-40108-HLT**

## MEMORANDUM AND ORDER

Two armed men robbed a food trailer. Within three hours of the robbery, officers identified Defendant Javier Martinez as a suspect and went to the house where he was staying. They called him out of the house and arrested him without a warrant. Officers then asked the homeowner and the owner of a minivan believed to be the getaway vehicle to sign a consent-to-search form, which each owner signed. Officers collected evidence in the home and in the minivan. After his arrest and being read his *Miranda* rights, Defendant spoke with an officer. A grand jury subsequently indicted Defendant and two codefendants on Hobbs Act robbery. Doc. 1.

Defendant moves to suppress the evidence seized during the search of the house and the minivan and his post-arrest statements. Doc. 56. He contends that his arrest without a warrant violated the Fourth Amendment and that the evidence subsequently obtained was tainted. The Court finds that the officers had probable cause to arrest Defendant but lacked exigent circumstances justifying his warrantless arrest in the house. Although his arrest was unlawful, the Court declines to suppress any evidence because the Court finds the officers obtained valid consents and finds that Defendant's post-arrest statements were not tainted. Finally, even if the consents were not valid, the Court finds the officers would have inevitably discovered the evidence seized from the house and minivan. The Court denies the motion.

## I.  BACKGROUND[1]

### A.  The Robberies

Israel Cortes owns a food trailer, Poblanos Grille, located at 3035 S.E. 6th Avenue, Topeka, Kansas. On August 29, 2019, at approximately 7:30 p.m., he was in the trailer with his wife, Clemencia Rojas-Sanchez, and his daughter, Paulina Cortes. Suddenly two men entered the trailer through the backdoor with pistols drawn, demanded money, and, after taking the money, fled on foot.

Paulina then called the police, and Officers Elder and Qualls responded. The family's interactions with Officers Elder and Qualls were recorded on the officers' Axon cameras. When they arrived, the officers asked Paulina and Clemencia where the suspects went. Paulina pointed, and Clemencia said that there was one Black man and one Mexican man. The officers drove south looking for the suspects before returning to the food trailer.

When they returned, Officer Elder stayed with Paulina and Clemencia while Officer Qualls, a canine officer, a canine partner, and another officer headed in the robbers' last known direction of travel, which was through a parking lot and into a heavy bush line. After going through the bush line and an open field behind some houses, the canine officer called the track as they approached the street. Officer Qualls returned to the food trailer to question the Cortes family.

During questioning, Paulina described the Black man, who was later described as the shorter man. She described him as wearing a black shirt, with a white shirt over his face, and wearing black shorts with neon green stripes. A few minutes later, Paulina clarified that both men were Mexican but that one man was darker. She described the darker man (i.e. the shorter man) as

---

[1]   The Court held an evidentiary hearing on August 26, 2020 and received as evidence 18 Axon videos (three are audio only), five exhibits, and testimony from Officer Brady Qualls, Sergeant Kevin Schulz, Detective Clinton Eubanks, Aaron Remfry, and Amy Chavez. The Axon videos are disjointed, and the Court attempts to synthesize the videos in this background.

skinnier and explained that he was the one wearing the white cloth over his face and was pointing his gun at Clemencia during the robbery. Paulina stated that Clemencia pulled his mask down and the family saw his face. Paulina could not describe his face, explaining that she forgot. Paulina later added that the shorter man had short or no hair. She described the taller man as fat with a skinny beard and wearing green athletic shorts, a black shirt, white shoes, and nothing covering his face.

At some point during the questioning, Israel returned to the scene after pursuing the robbers and joined the conversation. Israel described the pistols as short, gray, and like Berettas. He described the "tall guy" as in his thirties, about six feet tall, stocky, with a skinny beard, wearing a blue shirt, no mask, and a cowboy-style hat with a flat bill. He thought the taller man's accent was from Michoacán, Mexico, and the man seemed familiar. He described the shorter man as skinny, twenty-seven or twenty-eight, and wearing a white t-shirt, a t-shirt with eye holes cut out over his face, and black or gray pants. Israel did not see any tattoos on their arms. But Paulina saw a large tattoo on one of their arms. Paulina and Israel thought the guns looked fake.

Clemencia did not speak English, so someone translated for her. Clemencia confirmed that both men were Hispanic. She described the taller man as 25-26, fat, and with a short beard. After pulling down the shorter man's mask, she saw that he was darker and had a skinny face. She did not see his face. She explained that she did not turn to see the shorter man's face because he was pointing his pistol at her. None of the three victims remembered any markings or tattoos on the men's faces. Paulina and Israel said that it happened too quickly. Israel and Paulina thought they would recognize the men if they saw them again, and Clemencia thought she would recognize the taller man.

Detective Eubanks also responded to the dispatch but, on the way to the scene, he was informed that a residence one block south and one block west of Poblanos Grille had a residential security video that may be relevant. He went to the residence and viewed the security video. The security video was time stamped 7:35 p.m. on August 29, 2019. The security video showed a two-tone minivan that had distinctive damage along the driver's side doors. In the security video, the minivan drove back and forth and eventually stopped on S.E. 7th Street when two subjects running southwest ran out of a tree line toward the minivan. The subjects got into the minivan, and the minivan then drove away. Detective Eubanks took some pictures of the security video on his cell phone but was unable to download the security video.[2] After viewing the security video, Detective Eubanks then went to Poblanos Grille and was briefed by Officers Qualls and Elder. The officers then left the scene.

Based on the gathered information, Officer Qualls thought this robbery sounded like an armed robbery that occurred the day before at Panderia Monterrey Bakery, which is cattycorner to Poblanos Grille. In the bakery robbery, two men wearing white rags as masks pointed pistols at customers and employees in the bakery and demanded money before fleeing. One of the armed robbers had a blue shirt and straw hat.

**B.      The Identification**

Less than an hour later, Paulina again called the police explaining the family had more information. Officers Elder and Qualls returned. Their interactions were again recorded on the officers' Axon cameras. When they arrived, Paulina and Clemencia were present. Clemencia showed them a picture of Defendant on a phone and said nothing. Defendant had facial tattoos.

---

[2]    Detective Eubanks testified that he requested that the Topeka Police Department Tech Unit download the security video. But, at the hearing, the security video had not been downloaded and was not available.

Paulina explained that the taller man looked and sounded familiar to Israel, so Israel called a friend after the officers left. The friend (later identified as Hever Barron) drove to the trailer and asked Israel to describe the shorter man. When Israel did, Barron looked someone up on Instagram and asked if he was the man. Israel and Paulina identified Defendant as the shorter, skinnier man and found him on Facebook. Paulina confirmed that Defendant was the shorter man, explaining "I do see his tattoos. . . . I'm sure about his tattoos." Paulina explained that Israel had left with Barron so Barron could show Israel where Defendant lived and that Barron had said that Defendant was in desperate need of money.

Israel and Barron then returned and joined the officers, Paulina, and Clemencia. Israel said that they found the guy. He had called Barron because Israel and Barron had worked with a man resembling the taller man in Lawrence a long time ago. Barron came to the trailer, and Israel and Paulina told him what happened. Barron explained to the officers that Paulina described the shorter man to him, and Barron knew exactly who it was. Barron then helped Israel and Paulina find the shorter man on Facebook.

Israel added that he also described the minivan he had seen in the security video to Barron. Barron showed the officers a Snapchat picture of a minivan and told them it was under Defendant's girlfriend's name, Amy Remfry. Officer Qualls thought the minivan in the Snapchat picture matched the minivan in a picture he had seen from the security video. The minivan was a light green/teal-colored Mercury Villager that appeared to have flame decals that had either peeled off or faded. But he could not see a license plate. Officer Qualls then confirmed the timeline: the family described the shorter man to Barron, Barron showed the family a picture of Defendant, and the family identified Defendant as the shorter man. Officer Qualls then told Israel not to go looking

for Defendant because Defendant was Sur-13 and MPG and had been released from federal prison about a year earlier.

Officer Qualls then determined that Amy Remfry was Amy Chavez and that Amy Chavez was the registered owner of a 1999 Mercury Villager registered at 320 S.E. Hancock, Topeka, Kansas. Officers Qualls and Elder left the scene and drove to 320 S.E. Hancock. As they approached, Officer Qualls saw the minivan parked on the street in the 300 block of S.E. Hancock. He also observed a male and a female walking in the front yard of the house and entering through the front door. He could see them because of his headlights and the porch light. Officer Qualls was positive the male was Defendant based on his face, his tattoos, his overall description, and the location being his girlfriend's house. Officer Qualls was also sure the woman was Amy based on her driver's license photos. Officer Qualls called Detective Eubanks informing him that the minivan was parked in front of the residence. Officers Qualls and Elder then parked in an alley about 150 yards away and surveilled 320 S.E. Hancock until others arrived.

Detective Eubanks responded to 320 S.E. Hancock around 10:00 p.m. When he arrived, he saw that the minivan appeared to be the same make and model and the same two-tone color as the minivan in the security video. He saw the same damage along the bottom of the driver's side doors. He shined his flashlight in the closed windows and saw a straw hat and blue shirt that he thought matched the descriptions of items involved in both robberies.[3] Officer Qualls then told Detective Eubanks that he believed Defendant and Amy to be in the house.

---

[3]    Detective Eubanks testified that a straw hat and blue shirt were items described in the Panderia Monterrey Bakery robbery.

### C.      The Arrest

Several officers arrived with Detective Eubanks. Officer Qualls testified that between five to ten officers responded because they were investigating an armed robbery, needed to be prepared for any situation, and wanted to keep the officers safe. A canine officer went to the back of the house. And several officers were scattered around the front yard. Some of the officers' actions are recorded on their Axon cameras.

After the officers were arranged, Officer Qualls proceeded to knock on the front door of 320 S.E. Hancock. He was certain Defendant was within, and he felt that he had probable cause to believe that Defendant had participated in at least the armed robbery of Poblanos Grille. Amy answered the door, stepped outside, and shut the door behind her. She was visibly pregnant, alert, and cooperative. Officer Qualls asked whether the minivan belonged to her, and she said it did. He then told her that Detective Eubanks wanted to speak with her.

Detective Eubanks spoke with Amy in the front yard. She confirmed the minivan belonged to her. She told Detective Eubanks that Defendant had borrowed it to go and mow grass and purchase formula. Detective Eubanks informed Amy that her minivan had been used in a robbery. He explained that he needed to seize it and apply for a search warrant. He added that the only way to get around that was if she gave him signed consent to search it. When he asked if she was willing, Amy replied that she was not sure. Detective Eubanks replied, "Ok. Well we'll seize it," and ended the conversation. At this point, Detective Eubanks also believed the officers had probable cause that Defendant had been involved in at least the armed robbery of Poblanos Grille based on the minivan and the items inside it.

By this time, Sergeant Schulz had arrived at 320 S.E. Hancock and had assumed tactical control of the situation. His job responsibilities include assuming tactical control of potentially

dangerous situations to ensure the safety of officers and citizens. He spoke with Amy and learned that her four children, her parents, and Defendant were inside the house.

Then Detective Eubanks, Sergeant Schulz, and another officer conferred about the situation. They decided to do a "breach and hold on the front door" to secure the house while they then went and applied for a search warrant. Detective Eubanks testified that he was concerned about the safety of the other people in the house, including the small children. He thought they had probable cause to believe that Defendant was involved in the Poblanos Grille armed robbery, which involved three subjects. Detective Eubanks did not think they could safely apply for a search warrant with the children, Defendant, and potentially another armed suspect in the house. Sergeant Schulz also wanted to remove the children and other residents because the situation could escalate and become extremely dangerous.

After conferring and deciding on an action plan, Sergeant Schulz calmly told Amy that they were going to ask everyone to come out of the house. She offered to ask Defendant to come out herself. Sergeant Schulz responded, "Well let me try first. I don't want you standing by the front door. That's not how we do business." He did not want to allow her to go back into an environment where she could potentially become a hostage or stop helping the officers. The parties dispute what happened next. Sergeant Schulz testified that Amy consented to removing the children. Amy testified that she did not consent. The Axon video is garbled and does not show Amy's response.

Several officers then gathered at the front door, including an officer with a rifle. The officers had their firearms ready but not pointed at people. Sergeant Schulz opened the front door and saw four children in the living room. He calmly but firmly asked the children to exit the house, and the three children capable of walking complied and went to their mother. The fourth child was

in a crib, so Officer Qualls briefly stepped into the house, pulled the crib to the front door, removed the infant, and gave the infant to Amy.

Sergeant Schulz then announced "Topeka police. Everyone at 320 Hancock come to the front door. Do it now." Defendant came into sight and the officers pointed their weapons at him, repeatedly ordering him to show his hands. They handcuffed him on the threshold of the door and placed him in a police vehicle. He was wearing a white tank top and black athletic shorts with neon green stripes running down the sides. Amy's parents, Aaron and Pauline Remfry, followed a minute later. An officer checked with Pauline that no one else was inside. Sergeant Schulz announced, "Topeka police," once more and ordered anyone else to exit. The officers then performed a four-minute "protective sweep" of 320 S.E. Hancock to secure it for a search warrant. No evidence was seized from 320 S.E. Hancock at this time. Sergeant Schulz testified that, after the children were removed, he believed they still had exigent circumstances to remove the other residents because there was an armed suspect and because evidence could be destroyed.

### D.    The Consents to Search

At this point, Aaron, Pauline, Amy, and her four children were standing across the street within 10 to 15 feet of each other. The children were eagerly chatting with a couple of the officers. They do not sound scared or distressed in Detective Eubanks's audio recording. With her parents nearby, Detective Eubanks asked Amy in a conversational tone how she felt about the minivan. He asked if they needed to seize the minivan and do a search warrant on it or if she was giving consent. Amy replied that she would consent. Detective Eubanks told another officer that they would not need a search warrant.

Before giving her the consent-to-search form, Detective Eubanks asked Amy a few questions. Amy told him that Defendant departed from the house at about 4:00 p.m. by himself

wearing a "wifebeater" and light blue, torn jeans and returned alone at about 9:30 p.m. wearing the same attire. He returned with baby formula and change. She said that he was wearing a gray and orange t-shirt and maybe shorts the day before. Amy added that Defendant had been evicted two weeks before and that he slept at her parents' house four to five nights a week. She stated that he did not have any bags there or even toiletries.

Detective Eubanks then gave Amy a consent-to-search form for her 1999 Mercury Villager. She testified that she read "bits and pieces" of the form and signed it. Detective Eubanks explained that the form said she was allowing the police to search the vehicle. He further explained that if she changed her mind at any point, she could tell them to stop and they would apply for the search warrant. He reiterated that she had the right to ask them to stop. The consent-to-search form she signed states:

> I, [Amy Chavez], having been informed of my constitutional right not to have a search made of the premises or vehicle hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, herby [sic] authorize [Detective Eubanks] . . . to conduct a complete search of my premises or vehicle . . . .
>
> These officers are authorized by me to take from my premises or vehicle any letters, papers, materials, or other property which they may desire. . . .
>
> I understand that any information or items obtained in the search could be used against me in court. This written permission is being given by me to the above named officers voluntarily and without threats or promises of any kind.

Detective Eubanks also gave Amy a blank copy of the form at her request.

After talking with Amy, Detective Eubanks talked to Aaron (the homeowner) about consenting to a search of the house. Aaron volunteered that he had a couple hundred dollars in the bedroom. Detective Eubanks explained that the officers were looking for evidence of the crime, including clothing, firearms, accessories, and money. He added that if Aaron felt uncomfortable,

he could tell the officers to stop at any time and they would stop searching and apply for a search warrant. Detective Eubanks then asked Aaron to sign an identical consent-to-search form for the residence. Detective Eubanks explained the form and that they were only interested in Defendant's items. Aaron asked what Defendant did, and Detective Eubanks said two armed robberies. Aaron read and signed the form.

Detective Eubanks then turned back to Amy and asked whose straw hat was in the minivan. She said it was Defendant's hat. They chatted about officers taking pictures of the minivan's exterior. Detective Eubanks asked if she had seen Defendant in shorts. He then added that he did not want to pit Amy and Defendant against each other, but that Defendant had made his own choices. Amy replied, "I totally understand" and said Defendant could have had shorts on under his jeans. Detective Eubanks then recorded Pauline's and all the children's information. He was courteous throughout, even making a few jokes and causing Amy to laugh at one point. He left an officer with the family explaining the officer could pass along Amy's or Aaron's change of mind about the search.

Detective Eubanks testified that neither Amy nor Aaron appeared to be under the influence of alcohol or drugs or suffering from any mental impairment. He thought they asked appropriate questions and their speech was coherent. Aside from telling Amy and Aaron that the officers would have to seize the minivan and house and apply for a warrant if they did not consent, Detective Eubanks made no threats, promises, or inducements to obtain consent. None of the officers had their weapons unholstered and several officers were in the area. Neither Amy nor Aaron objected to or sought to limit the searches as the officers performed them. If Amy and Aaron had not consented to the searches, Detective Eubanks testified that he would have seized the minivan and

house and applied for search warrants. Based on his experience with Shawnee County district judges, he believed he would have been able to secure warrants.

Amy testified that she is a stay-at-home mother but former military. She testified that she owned the minivan, but that Defendant periodically borrowed it. Amy testified that she did not feel like she had a choice in signing the consent-to-search form because it was 10:30 p.m., there was a "huge police presence," her kids were outside in pajamas with no shoes, and it started to rain. Aaron testified that he and his wife were in bed when the officers arrived. He explained that Defendant was a welcome guest in his home. He agreed that he spoke with Detective Eubanks about the consent-to-search form and understood that if he did not consent, the officers would hold the house until they got a search warrant. He figured a search was going to happen either way and that they would just be out there longer if he did not sign it.

The officers then performed the searches. The officers seized a blue Kansas City ("KC") Royals t-shirt, a straw hat, a torn pair of pants with a camouflage pattern, and white shirts from the minivan and a pair of torn blue jeans from the house.

### E.     The Interview

After arresting Defendant, officers took him to the Topeka Police Department and placed him in an interview room around 10:15 p.m. He sat in the room for an hour and fifty minutes until Detective Eubanks arrived. While he waited, he was given water, a blanket, and offers to use the restroom. The two chatted about Defendant's work as a roofer, his employers, his living situation, his sleeping arrangements at 320 S.E. Hancock, and how he often stayed outside on the porch or slept in the minivan. Detective Eubanks then read Defendant's *Miranda* rights to him, and Defendant consented to speak with him. The interview lasted an hour, and Defendant maintained his innocence of the robberies throughout. He stated that he loaned the minivan to friends that

evening while he mowed a lawn. He did not want to give their names because he was scared for his family. He commented that he could not go back to prison and that he does not get into anything anymore. He made several references to being able to help the police because he notices things. He said the straw hat was his but that he did not have a blue KC Royals shirt. When Detective Eubanks told him that the Poblanos Grille victims had identified him based on his tattoos, he said that a lot of people look like him and have tattoos like his. Detective Eubanks testified that Defendant did not appear to be under the influence of alcohol or drugs or laboring under a mental impairment. After the interview, Defendant declined to provide a DNA sample saying he would wait for his lawyer.

## II.   ANALYSIS

Defendant moves to suppress the evidence seized during the search of the minivan and the house and his post-arrest statements. He contends that his arrest without a warrant violated the Fourth Amendment and that the evidence subsequently obtained was tainted. To resolve this motion, the Court must determine: (1) whether Defendant's arrest was unlawful and, if so, (2) whether the subsequent consents to search given by Amy and Aaron and Defendant's post-arrest statements were tainted by Defendant's unlawful arrest.

### A.   The Arrest

The Fourth Amendment prohibits officers from arresting suspects in their homes without either a warrant or probable cause and exigent circumstances. *United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008). This protection extends to homes where a suspect is staying as a guest. *Minnesota v. Olsen*, 495 U.S. 91, 95-97 (1990). Here, the government does not challenge that Defendant was staying at 320 S.E. Hancock as a guest, that the officers lacked a warrant for his arrest, and that the officers needed probable cause and exigent circumstances to lawfully arrest

Defendant. Thus, Defendant's arrest was unlawful unless the officers had (1) probable cause <u>and</u> (2) exigent circumstances.

### 1. Probable Cause

The Court first determines probable cause. Probable cause to arrest exists when the facts would "warrant a man of reasonable caution in the belief" that the defendant has committed or is committing an offense. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). The Court finds that the officers had probable cause to believe that Defendant robbed Poblanos Grille when they arrested him. The officers knew that two armed men robbed Poblanos Grille around 7:30 p.m. They knew that the robbers fled southwest, and they knew that a security video from a house one block south and one block west of Poblanos Grille showed two men who were running southwest emerge from a tree line and climb into a two-tone minivan with distinctive damage to the driver's side door about the same time. The officers knew that, within a few hours, at least two of the victims identified Defendant as one of the robbers. And they knew that a minivan similar to the minivan depicted in the security video was registered to Defendant's girlfriend at 320 S.E. Hancock.[4] After driving by this house, officers knew that the minivan was parked on a public street in front of the house, that the minivan had damage to the driver's side door, and that inside the minivan, in plain view, was a straw hat and blue shirt, which were similar to items described by the victims of the Poblanos Grille robbery and the Panderia Monterrey Bakery robbery. And the officers knew that Defendant had recently entered 320 S.E. Hancock and was inside.[5] The Court

---

[4]   At the hearing, Defendant challenged whether the Snapchat picture of the minivan was similar to the minivan in the security video. The Court credits the testimony of Officer Qualls and Detective Eubanks on this issue. The Court observed the demeanor of both men. They listened attentively to the questions, answered, and provided explanation when appropriate. Their testimony is also corroborated by other evidence including the driver's-side-door damage depicted in the security video picture and observed on Amy's minivan at the residence.

[5]   During the hearing, Defendant questioned how Officer Qualls could see Defendant and Amy given the late time of night. The Court credits Officer Qualls's testimony that he observed Defendant entering 320 S.E. Hancock. The Court observed Officer Qualls's testimony and demeanor. When he realized there was some confusion on

finds that these facts warrant a man of reasonable caution in the belief that Defendant committed the Poblanos Grille robbery.

### 2.      Exigent Circumstances

The Court next determines whether exigent circumstances existed. Exigent circumstances exist when an officer reasonably believes there is an immediate need to (1) secure the personal safety of all in harm's way, including the suspect, (2) impede the possibility of escape, or (3) prevent destruction of evidence. *United States v. Creighton*, 639 F.3d 1281, 1288 (10th Cir. 2011). The government contends exigent circumstances existed because of the immediate need to secure the personal safety of the officers and the people inside 320 S.E. Hancock. The Court disagrees.

The officers located the minivan and observed Defendant entering the house around 9:30 p.m. The officers then parked down the street and surveilled the house. There is no evidence that the officers believed Defendant would be leaving the house again that night, and, even if he did leave, there is no evidence indicating that the surveilling officers would have been incapable of following him. A few minutes later, more officers arrived and further secured the perimeter. The officers conferred, approached the house, knocked on the door, and Amy exited. She did not seem distressed or scared. She did not indicate anyone inside was in danger or in need of aid. She cooperated with the officers and even offered to go back into the house and ask Defendant to come out. The officers rejected her offer and, instead, proceeded to open the front door, remove the children, call out the other residents with weapons drawn, and arrest Defendant. From the time the officers saw Defendant enter the house until his arrest, there is <u>no</u> evidence that Defendant made threatening movements, statements, or the like toward the officers or toward anyone in the house.

---

when and how he observed Defendant, he clarified his testimony. And Detective Eubanks corroborated his testimony. Amy also told the officers that Defendant was inside.

Based on these facts, the Court finds that exigent circumstances did not exist. There is <u>no</u> evidence of an <u>immediate</u> need to protect the safety of the officers or the people inside 320 S.E. Hancock. There is <u>no</u> evidence Defendant threatened anyone during the exchange or that anyone in the house was in danger or need of aid. The officers had the perimeter under control, and it seems they could have temporarily maintained the perimeter and applied for a warrant.

The government counters that the nature of the suspected offense (armed robbery) in combination with Defendant's criminal background, gang affiliation, and the presence of young children in the home constitute exigent circumstances. But the Supreme Court has found exigent circumstances lacking for more egregious crimes when, like here, there is <u>no</u> evidence that the defendant is threatening officers or others. *Compare Olson*, 495 U.S. at 100-01 (finding no exigent circumstances when the getaway driver for an armed robbery and murder, was inside a home with two individuals "with no suggestion of danger" to those individuals and the house was surrounded by three or four police squads) *with Creighton*, 639 F.3d at 1289-91 (finding exigent circumstances in apparent hostage situation). And the government does not specifically identify aspects of Defendant's criminal background that indicate an immediate or probable threat to the officers or other people inside (*e.g.*, instances when he took hostages, threatened or harmed officers, barricaded himself, etc.). *See United States v. Kinney*, 2019 WL 5213022 (D.N.M. 2019) (finding no exigent circumstances when the defendants were suspects in armed robberies one of which had occurred just hours earlier, had known felonies involving firearms, and had engaged in counter-surveillance). The Court does not doubt that the officers acted with a sincere desire to protect the public and out of genuine concern for people (and particularly the children) in the house. But,

under the applicable legal standards, the government has not shown that exigent circumstances justified Defendant's warrantless arrest.[6]

## B.     Taint

Because Defendant's arrest was unlawful, the Court must determine whether the subsequent consents to search given by Amy and Aaron and Defendant's post-arrest statements were tainted by Defendant's unlawful arrest.

### 1.     Aaron's and Amy's Consents

The Court starts with Aaron's and Amy's consents. After arresting Defendant, Detective Eubanks secured consent from Amy for searching the minivan and from Aaron for searching 320 S.E. Hancock. Defendant contends the consents were tainted by his unlawful arrest and the resulting evidence should be suppressed.[7] When a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that there was "a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Melendez–Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994). Although these two requirements often overlap, they address separate constitutional values and are not always coterminous. *Id.* at 1054.

---

[6]  Because a protective sweep incident to arrest is contingent on a lawful arrest, the officers lacked the predicate for a protective sweep. *See United States v. Bagley*, 877 F.3d 1151, 1153-54 (10th Cir. 2017).

[7]  The government makes a threshold argument that Defendant lacks standing to challenge the consents because Defendant does not establish a subjective expectation of privacy in the minivan or in 320 S.E. Hancock that society is prepared to recognize as reasonable. But Defendant argues that the illegality of his arrest taints those consents, rendering the seized evidence the fruit of the poisonous tree. So the issue for the Court is whether the officers obtained the seized evidence by exploitation of the illegality of Defendant's arrest or, instead, by means sufficiently distinguishable to be purged of the primary taint. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (suppressing drugs found in a co-defendant's house as poisonous fruit of the defendant's illegal arrest without considering the defendant's standing in the co-defendant's house); *United States v. Olivares-Rangel*, 458 F.3d 1104, 1117-21 (10th Cir. 2006). And the government does not explain how Defendant lacks standing to make that challenge.

### a.    Voluntariness

The Court first determines whether the consents were voluntary. Consent is voluntary if the government establishes by "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." *United States v. Warwick*, 928 F.3d 939, 945 (10th Cir. 2019) (internal quotation omitted). Courts consider the totality of the circumstances in assessing voluntariness including:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Id.* (internal quotation omitted).

The Court finds both consents were voluntary. After the officer knocked, Amy exited the house and spoke with them. She was alert and cooperative. Detective Eubanks told her that her minivan had been involved in a robbery and asked whether she would consent to a search. Amy answered that she was not sure. She continued talking with the officers and offered alternative suggestions to their plans. Aaron subsequently exited the house when armed officers called him out.

After the officers arrested Defendant, Detective Eubanks spoke with Amy and Aaron about the searches in a polite and conversational tone. He spoke with them across the street from the house. He did not handcuff them, threaten them with arrest, or tell them they were suspects. He told them the officers were investigating Defendant. Neither Amy nor Aaron appeared impaired. They were together, and Pauline was also present. Detective Eubanks gave Amy and Aaron a

consent form. He explained the form and the right to refuse consent. He truthfully told them if they did not consent, he would seize the minivan and house and apply for a warrant.[8] He answered any questions, and they signed the forms. After they signed, Detective Eubanks gave Amy a blank form upon request and left an officer with them to convey any limitations or withdrawal of consent.

Defendant argues the consents were not voluntary because it was late at night, there was a large police presence with weapons, the children were in pajamas with no shoes, and it started raining. Amy testified that she felt like she had no choice but to sign for essentially the same reasons, and Aaron testified that he thought the search was going to happen either way.[9] Defendant raises some valid concerns. But they are ultimately unpersuasive. It was late at night. But Amy was awake when the encounter started, and Aaron was in his bedroom, possibly asleep. They were both alert during the encounter and capable of asking questions. Neither sounded emotional. There were multiple officers, but Amy, Aaron, and Pauline were together during the conversation. The conversation occurred on a public street in familiar territory, and they were only speaking with Detective Eubanks while other officers chatted with the children. The officers had weapons, but

---

[8]    For the reasons discussed below, *see infra* Section II.C., the Court finds the officers had probable cause to seize the minivan and 320 S.E. Hancock while they applied for a warrant. *See Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (finding officers can seize a dwelling with probable cause to preserve evidence while a warrant is obtained); *United States v. Cruz-Mendez*, 467 F.3d 1260, 1268 (10th Cir. 2006) (finding an officer's assertion that he would get a search warrant if he did not receive consent did not improperly overpower the subject's will because they "probably" had sufficient information to obtain a warrant); *United States v. Elie*, 111 F.3d 1135, 1146 (4th Cir. 1997) (finding law enforcement could truthfully give the defendant his options of having his possessions secured by either hotel management or the police even if the options forced the defendant to choose between the two unpleasant alternatives).

[9]    Defendant also contends that Amy initially refused consent to search the minivan and refused consent to let the officers remove her children from the house. She did not initially refuse consent to search the minivan; she said she was not sure. This is not an unequivocal "no" as Defendant suggests. Moreover, after listening to the recording and evidence, the Court finds that Detective Eubanks's subsequent request was more to clarify her current position and was not an attempt at coercion. Similarly, the Court agrees that the government has not established that she consented to removing her children—the recording is garbled and, because Amy is not shown, there is no evidence of her body language or actions. But the Court finds, again, that she did not unequivocally refuse consent. Rather, it seems that she made a counteroffer (to ask Defendant to come out). Sergeant Schulz refused the offer. And she did not further object to his proposal.

there is no evidence that any officer had an unholstered weapon at this time. And the officers did not create the difficult circumstances with the weather.

The Court's conclusion is further bolstered by its observations of Amy's and Aaron's testimony and the audio recording of the conversation with Detective Eubanks. Based on her demeanor and testimony, Amy is an articulate, intelligent, and assertive woman who does not seem particularly susceptible to pressure. She is former military and was raising four (now five) children. During the encounter, she seemed to understand the gravity of the situation based on her questions and demeanor. She knew Defendant had been arrested before. And she was comfortable chatting, and at one point laughing, with Detective Eubanks. Likewise, based on his testimony, Aaron is articulate and intelligent. He asked pertinent questions and seemed to understand the situation and his options.

In conclusion, the Court finds that there are some aggravating aspects. But, after reviewing all the evidence, observing the testimony, and considering the totality of the circumstances, the Court finds that the consents were voluntary and were not the result of duress or coercion. The Court finds that Amy and Aaron understood the situation, that they understood their constitutional rights and options, and that they understood that they had the option to say "no." They chose to consent. The fact that they made this choice after being truthfully told their options, neither of which they found pleasant, does not vitiate the validity of those consents.[10, 11]

---

[10]  Defendant attempts to compare this case to *United States v. Maez*, 872 F.2d 1444 (10th Cir. 1989). But, overall, the record is distinguishable. As a few examples, unlike *Maez*, there is no evidence that either Amy or Aaron were crying, scared, upset, or angry. The children had not been handcuffed, and Amy and Aaron had the support of each other and Pauline.

[11]  Defendant also contends that the officers were required to get Amy's, Pauline's, and his consent to search 320 S.E. Hancock as well as his consent to search the minivan. The Court disagrees. The officers had no obligation to determine everyone who might have standing and then seek consent from all those individuals as well. *See Georgia v. Randolph*, 547 U.S. 103, 121 (2006) ("[T]he potential objector, nearby but not invited to take part in the threshold colloquy, loses out."). In addition, on these facts, Defendant cannot complain that he was removed from the premises to prevent him from objecting to the search. *See Fernandez v. California*, 571 U.S. 292, 302-

### b.      Break in the Causal Chain

Because the Court finds the consents voluntary, it must next determine whether there was "a break in the causal connection between the illegality and the evidence thereby obtained." *Melendez–Garcia*, 28 F.3d at 1053. The Tenth Circuit has found the following factors relevant to this determination: (1) the temporal proximity between the illegality and the consent to search, (2) the presence of intervening circumstances, and <u>particularly</u> (3) the purpose and flagrancy of the official misconduct. *Id.* at 1054 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

The first factor weighs against a break in the causal chain. Shortly after removing the children, calling out the other residents, and arresting Defendant while armed officers pointed firearms at him, Detective Eubanks approached Amy and Aaron about consenting to the searches. This short period of time weighs against a break in the causal chain.

The second factor weighs slightly in favor of a break in the causal chain. Detective Eubanks approached Amy and Aaron across the street from the house shortly after Defendant's arrest. Neither the location nor the environment had meaningfully changed. But, importantly, Detective Eubanks then engaged in a conversation with Amy and Aaron about their constitutional rights. He asked them to consent, truthfully told them what would happen if they did not consent, and answered their questions. He gave each of them a consent-to-search form and let them decide. *See United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010) (finding that explaining a consent form and advising an individual of his or her right to withhold consent is an intervening circumstance). This conversation and the signed consent forms weigh in favor of a break.

---

03 (2014). Even though his arrest within the home was unlawful, Defendant was removed to the police department pursuant to a lawful detention based on probable cause. *See id.*

Case 5:19-cr-40108-HLT   Document 85   Filed 09/25/20   Page 22 of 27


The third factor, which is particularly important, weighs heavily in favor of a break in the causal chain. The officers did not act with an improper purpose or with flagrant misconduct in arresting Defendant. Rather, two armed robberies had occurred on back-to-back days. The second one occurred a few hours earlier and, based on the victim reports, the shorter robber (suspected to be Defendant) had held a firearm to Clemencia's head. The officers, who were aware of Defendant's criminal background and gang affiliation, knew he was at 320 S.E. Hancock with four small children. Based on its observations at the hearing and from the record, the Court finds that the officers removed the residents and arrested Defendant out of a genuine concern for the safety of the officers, the children, and the other people inside. All three officers testified to this concern. The Court finds this testimony credible. Although the Court finds that exigent circumstances did not justify this course of conduct after carefully analyzing the law and evidence, it equally finds that the officers did not engage in this conduct to intentionally violate Defendant's rights or to improperly acquire evidence. *See, e.g.*, *id.* at 1261 (explaining that improper purpose and flagrant misconduct occur when (1) the impropriety of the conduct was obvious or the official knew that it was likely unconstitutional, and (2) the misconduct was investigatory in design).

After considering all three factors, the Court finds that there was a break in the causal chain. This break in combination with the finding of voluntariness renders the consents valid and not tainted. The officers had constitutional grounds to search the minivan and 320 S.E. Hancock. The evidence was properly seized. And this portion of the motion to suppress is denied.

### 2. Defendant's Statements

After his arrest, Defendant spoke to Detective Eubanks. Defendant contends his post-arrest, post-*Miranda* statements to Detective Eubanks were tainted by his unlawful arrest and should be suppressed. The Court disagrees.

First, this argument seems to misapply the exclusionary rule. The exclusionary rule protects against the use of a suspect's statements that are the <u>product of the illegality</u>. *See New York v. Harris*, 495 U.S. 14, 18-19 (1990). Here, the illegality is not Defendant's arrest; rather it is his arrest <u>in 320 S.E. Hancock</u> absent either a warrant or probable cause and exigent circumstances. The requirement for either a warrant or probable cause and exigent circumstances before arresting a suspect <u>in the home</u> is designed to protect the sanctity of the home. The requirement is not designed to protect statements a suspect makes outside of the home or after arrest. Thus, because Defendant's post-arrest statements are not the product of the illegality (*i.e.*, the arrest in the home and the associated sanctity of the home), he has not identified a Fourth Amendment basis for suppressing his statements.[12]

Second, even assuming Defendant has identified a Fourth Amendment basis for suppressing his statements, the Court finds that his statements are not tainted by his unlawful arrest. Like the above, courts consider the following to determine whether a suspect's statements are tainted by his unlawful arrest: (1) the temporal proximity between the illegality and the statements, (2) the presence of intervening circumstances, and <u>particularly</u> (3) the purpose and flagrancy of the official misconduct. *See Maez*, 872 F.2d at 1454-57 (outlining factors identified in *Brown*, 422 U.S. at 603-04, and applying them to post-arrest statements).

The first factor weighs against the taint being removed. Defendant made the statements within a few hours of his unlawful arrest. Although he had time to privately contemplate his situation, the Court finds this factor weighs in Defendant's favor.

The second factor weighs slightly in favor of the taint being removed. Defendant was questioned at the police station while in custody. But, as he waited, he was offered water, a blanket,

---

[12]   Defendant seems to tacitly recognize this point. Doc. 56 at 17.

and opportunities to use the restroom. Detective Eubanks then entered the room alone and engaged

him in conversation. Detective Eubanks's tone was conversational and not threatening. Defendant

does not sound scared in the recording and seems to understand his situation. Importantly,

Detective Eubanks advised him of his *Miranda* rights, and Defendant then agreed to talk with him.

The third factor firmly weighs in favor of the taint being removed. Again, Detective

Eubanks had probable cause to arrest Defendant but lacked exigent circumstances to arrest him in

the home. For the reasons previously stated, *see supra* Section II.B.1.b., the Court finds that he

and the other officers acted out of genuine concern for the safety of the people inside 320 S.E.

Hancock. They did not intentionally violate Defendant's constitutional rights and were not seeking

to improperly acquire evidence.

After considering all three factors, the Court finds that Defendant's post-arrest, post-

*Miranda* statements were not tainted by his unlawful arrest. The motion to suppress as to

Defendant's statements is denied.[13]

### C.       Inevitable Discovery

As an alternative to valid consents, the government relies on the inevitable discovery

doctrine and argues that the officers would have gotten search warrants for the minivan and 320

S.E. Hancock. The Court agrees.

---

[13]   The Court does not understand Defendant's brief to raise a Fifth Amendment argument. It makes passing reference to the Fifth Amendment but does not articulate an argument. Out of an abundance of caution, the Court notes that this argument would also fail. *See United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020) (outlining analysis). Under the totality of the circumstances, Defendant was not in a coercive environment during the questioning. He was not threatened, and there is no evidence that he was unusually susceptible to coercion, that he was under the influence of drugs or alcohol, or that he was suffering from a mental defect. Defendant was advised of his *Miranda* rights and spoke with Detective Eubanks. Their conversation was relatively short, and he maintained his innocence throughout. This was not Defendant's first arrest, and he demonstrated understanding of his rights by refusing to provide a DNA sample without an attorney. For these reasons, a Fifth Amendment argument would fail.

The inevitable discovery doctrine requires the government to prove by a preponderance of the evidence that the evidence would have been discovered absent the Fourth Amendment violation. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). To apply this doctrine, courts must have "a high level of confidence" that a warrant would have issued and that the evidence would have been found. *Id.* at 541-42. In deciding this "ultimate question," courts consider:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Id.* at 541, 543.

The first and third factors weigh against inevitable discovery. Although there was talk of applying for warrants, there is no evidence that the officers were in the process of securing warrants that night or that they subsequently applied for a warrant.

The second factor, which is the primary question, weighs heavily in favor of inevitable discovery. *See United States v. Warwick*, 2017 WL 3822076, at *13 (D.N.M. 2017), *aff'd on other grounds*, 928 F.3d 939 (10th Cir. 2019) (finding that the overwhelming evidence of probable cause outweighed the absence of the first and third factors). The officers had a strong case of probable cause to search the minivan and 320 S.E. Hancock at the time of the searches. *See supra* Section II.A.1. In short form, the officers knew that at least two of the Poblanos Grille victims identified Defendant as the shorter armed robber.[14] The officers knew that the security video from a nearby

---

[14] Defendant challenges the reliability of these identifications. The Court considered this challenge in another motion and denied it. The Court considers only the record identified for the motion to suppress in resolving the motion to suppress. But, even if the shortcomings identified by Defendant in litigating the motion on eyewitness

home showed two men getting into a minivan believed to be the getaway car. The minivan in the security video matched Defendant's girlfriend's minivan in terms of make, model, color, and distinctive damage. Approximately three hours after the robbery, the officers located the minivan. It was parked on a public street by 320 S.E. Hancock. In plain view, they saw a blue shirt and straw hat that were like items involved in the Poblanos Grille robbery and the Panderia Monterrey Bakery robbery. The officers knew Defendant was inside 320 S.E. Hancock. And, after initially talking with Amy, they knew that Defendant had borrowed her minivan earlier that day. Although Amy told them that she did not see Defendant bring any guns or money into 320 S.E. Hancock, her words did not remove or meaningfully undermine probable cause. Finally, the Court credits Detective Eubanks's testimony that, based on his experience with Shawnee County district judges, the officers would have secured a warrant. *See Christy*, 739 F.3d at 543 (noting that the district court credited testimony that officers had easily obtained similar warrants in the past). Based on these facts, the Court finds that the officers had probable cause to believe that the minivan and 320 S.E. Hancock contained evidence of the armed robberies.

The fourth factor also weighs heavily in favor of inevitable discovery. *See supra* Sections II.A.2 and II.B.1.b. Highly summarized, the Court finds that the officers did not "jump the gun" to search the minivan and 320 S.E. Hancock because they lacked confidence in the strength of the case or hoped to bolster the investigation with evidence. Quite the opposite. The evidence indicates the officers felt so strongly about their case and Defendant's involvement in the robberies that they were concerned he might hurt someone to avoid arrest. They acted to keep everyone, particularly the young children, safe. And they gave Amy and Aaron the options, after truthfully telling them

---

identification are considered, those shortcomings do not significantly undermine the strength of the probable cause finding. The outcome would be the same.

what would happen and advising them of their rights, to consent or to wait while they applied for a warrant. After considering all four factors, the Court finds that the officers would have inevitably secured search warrants for the minivan and 320 S.E. Hancock and seized the physical evidence. So, for this alternative reason, the motion to suppress as to the physical evidence is denied.[15]

## III.    CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's Motion to Suppress (Doc. 56) is DENIED.

IT IS SO ORDERED.

Dated: September 25, 2020          /s/ *Holly L. Teeter*
                                    HOLLY L. TEETER
                                    UNITED STATES DISTRICT JUDGE

---

[15]   Defendant's motion to suppress is limited to the evidence seized from the search of the minivan and 320 S.E. Hancock and Defendant's post-arrest statements. It does not seek to suppress the clothing (*e.g.*, the shorts) Defendant was wearing at the time of arrest. Given that Defendant does not raise this issue in combination with the rationale of *Harris* (*see supra* Section II.B.2.), the Court questions the necessity of the government's argument that the officers would have inevitably obtained an arrest warrant. Again, however, out of an abundance of caution, the Court finds that the officers would have secured an arrest warrant for Defendant and obtained his clothing. Although the officers were not in the process of securing an arrest warrant and did not ultimately get one, the officers had a strong case of probable cause for his arrest and they did not "jump the gun" to arrest him out of a lack of confidence in their case for the reasons repeatedly discussed above.